34

The State of Ohio, Appellant, *v.* Ostrowski, Appellee.

[Cite as State v. Ostrowski (1972), 30 Ohio St. 2d 34.]

(No. 71-410—Decided April 26, 1972.)

36

*Mr. John T. Corrigan*, prosecuting attorney, *Mr. Harvey R. Monck* and *Mr. Vincent Feudo*, for appellant.

*Messrs. McCafferty, Perelman & Holtz* and *Mr. A. Albert Perelman*, for appellee.

LEACH, J. The decision of the Court of Appeals, reversing the judgment of delinquency, set forth "four grounds for doing so on the record in this case." Essentially, the Court of Appeals held that the trial court had erred (1) in not suppressing the handwriting exemplar, (2)

in excluding the parents from the courtroom until they had testified as witnesses, under an order for the separation of witnesses, (3) in the exclusion of certain testimony on the basis of noncompliance with the requirements of R. C. 2945.58, relative to notice of intention to claim an alibi, and (4) in the overruling of a motion to strike certain testimony of the Fire Chief of Independence, Ohio. On consideration of the issues presented herein, we find ourselves in disagreement with the Court of Appeals, and, thus, we reverse.

## I

The Court of Appeals concluded that the handwriting exemplar should have been suppressed, both on the basis of the Fifth Amendment privilege against self-incrimination and on the basis of the Fourth Amendment privilege against "unreasonable searches and seizures." In concluding a Fifth Amendment violation, the Court of Appeals attached particular significance to the fact that the handwriting exemplar contained "the very words written on the mirror" and "thus should have been suppressed on this ground." Essentially it appears to have been the view of the Court of Appeals that the exemplar thus had a "special testimonial value," and thus was required to be suppressed in the admitted absence of any *Miranda* warnings.

In support of this premise the court cited two cases, *Serao* v. *United States* (1968), 390 U. S. 202, and *United States* v. *Green* (1968), 282 F. Supp. 373. In *Serao*, the United States Court of Appeals of the Second Circuit (367 F. 2d 347) had rejected the defendant's claim that the Fifth Amendment privilege could be a basis for excluding a handwriting specimen of the defendant, originally executed as a communicative writing but which was used solely as a handwriting standard for identification purposes and which did not communicate any information relating to the issues being tried. While, as noted in the Court of Appeals decision, the judgment of the Second Circuit Court of Appeals in *Serao* was reversed by the United States Supreme Court, its short *per curiam* opinion (390 U. S. 202)

merely ordered that "the judgments of the courts below are vacated and the cases are remanded for further consideration in the light of *Marchetti* v. *United States*," 390 U. S. 39.

The holding of the United States Supreme Court in *Marchetti* was *not* concerned in any way with handwriting exemplars. Instead, it held that the statutory obligations to register and to pay an occupational tax for engaging in the business of accepting wagers, as required by federal statutes, were essentially inseparable elements of a single registration procedure; that for purposes of the constitutional privilege against self-incrimination, wagering is an area permeated with criminal statutes; and thus that persons asserting the constitutional privilege against self-incrimination could not be convicted for failing to comply with these statutory requirements.

The *Green* case, *supra*, involved an action wherein the government sought a court order to compel the defendant to furnish a handwriting exemplar displaying selected phrases allegedly germane to the prosecution. The United States District Court for the Southern District of Indiana refused to so order, pointing out that since the defendant was employed by the United States, the government already had samples of his handwriting available through this employment. That court attempted to distinguish the holdings of the United States Supreme Court in *Schmerber* v. *California* (1966), 384 U. S. 757, and *Gilbert* v. *California* (1967), 388 U. S. 263, upon the basis that in *Gilbert* the defendant had voluntarily given handwriting exemplars, and upon the basis, with which we are not in agreement, that "the result of requiring the accused to write his name would have the same far-reaching effect as if the accused were required to make a verbal or written admission."

In the instant case, it is admitted that the exemplar was given voluntarily. An examination of the exemplar clearly indicates that it contains nothing "testimonial" in character, and from an evidentiary standpoint it was used solely for handwriting identification purposes. While it did contain three of the four words printed on the mirror,

it also contained, on what appears to be a standard form of the detective bureau, James Ostrowski's printing of some fourteen names, three street addresses, and all of the Arabic numerals. The expert testimony, both of the prosecution and the defense, was not limited merely to a comparison of the three words which appeared both on the mirror and on the exemplar.

*Schmerber, supra*, at page 764, draws a distinction between "communications" or "testimony" and "that compulsion which makes a suspect or accused the source of 'real or physical evidence.'" In this connection, see the opinion of Mr. Justice Holmes in *Holt* v. *United States* (1910), 218 U. S. 245. That the principle announced in *Holt* and *Schmerber* is applicable to handwriting exemplars has been recognized in *Gilbert* v. *California, supra* (388 U. S. 263):

"* * * The taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. The privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence". . . .' *Schmerber* v. *California*, 384 U. S. 757, 763-764. One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection. *United States* v. *Wade, supra*, at 222-223 * * *."

In *United States* v. *Wade* (1967), 388 U. S. 218, 222, decided the same day as *Gilbert*, the court stated that "compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a 'testimonial' nature"; that such compulsion only required the

defendant "to use a voice as an identifying physical characteristic, not to speak his guilt."

We conclude, therefore, that a handwriting exemplar, used solely for identification purposes, is a mere identifying physical characteristic, and as such is outside the scope of the Fifth Amendment privilege against self-incrimination—even if the words written are identical to the words contained in a writing directly linked to the crime. Further, there is no requirement that *Miranda* warnings be given prior to the giving of such a handwriting exemplar.

In the instant case, as heretofore noted, the Court of Appeals did not rely solely upon a claimed violation of the Fifth Amendment privilege as a basis for its holding that the handwriting exemplar should have been suppressed. It also found that the exemplar was taken under circumstances which constituted a violation of the juvenile's Fourth Amendment rights against "unreasonable searches and seizures"; thus, that the exemplar should have been suppressed as "tainted fruit" under the exclusionary doctrine of *Wong Sun* v. *United States* (1963), 371 U. S. 471. In *Wong Sun*, the United States Supreme Court held that any evidence obtained as a product of an unlawful arrest constitutes tainted "fruit" thereof and thus must be excluded from evidence.

In *Davis* v. *Mississippi* (1969), 394 U. S. 721, the Supreme Court held that detention for the sole purpose of obtaining fingerprints and without any probable cause for arrest or detention constituted an unreasonable seizure of the person in violation of the Fourth Amendment, and thus that fingerprints so obtained were inadmissible at trial as "tainted fruit" of the unlawful arrest. Thus the *Davis* case stands for the proposition that even mere "identifying physical characteristics," such as fingerprints and handwriting exemplars, may be viewed as "tainted fruit" under the exclusionary doctrine, if such is the product of an unreasonable search or seizure.

In the instant case, however, there was no evidence of an unlawful arrest and no evidence that the handwriting exemplar was given involuntarily. Thus, there was no

showing of a violation of the Fourth Amendment privilege against unlawful search and seizure, and thus no basis for excluding the exemplar as being "tainted fruit" resulting from such a violation.

Here, the record shows that the juvenile was not detained unlawfully, but instead was questioned in his own home under circumstances which indicate that no arrest, either lawful or unlawful, was made at that time.* As heretofore noted, by the testimony of the juvenile himself, he gave the handwriting exemplar freely and voluntarily. As a result, we find no basis for exclusion of the handwriting exemplar, under either the Fourth or the Fifth Amendment.

## II

The second ground for reversal relied upon by the Court of Appeals was that the trial court had erred in excluding the parents from the courtroom, under an order

---

*The following testimony of the juvenile on the motion to suppress is particularly relevant on the issue of "unlawful arrest":

"Q Now, did the officer ever indicate to you that you were under arrest?

"A Never told me but it just seemed like it.

"Q You just felt you were under arrest?

"A Yes, I did.

"Q And you must have been pretty surprised when he didn't take you down to the station that night then?

"A Could you repeat that?

"Q I say you were surprised then that he didn't take you right out of the house to the station, weren't you?

"A He couldn't, I wasn't surprised because there wasn't any proof. They didn't have any proof so, that I did the fires or anything.

"Q So you weren't surprised that they didn't take you to the station? You were not surprised?

"A I was not.

"Q And you knew they couldn't take you to the station because they had no proof?

"A Right.

"Q Do you know what proof they had?

"A On Monday you mean?

"Q Yes.

"A Not any that I knew of on Monday."

In denying the motion to suppress the handwriting, the trial judge stated that he did "not believe that there was an arrest made here."

for the separation of witnesses. Here, reliance is had upon that sentence of R. C. 2151.352 which provides that ''the parents, custodian, or guardian of such child, and any attorney at law representing them or the child, shall be entitled to visit such child at any reasonable time, be present at any hearing involving the child, and be given reasonable notice of such hearing.''

Taken as a whole, the purpose of R. C. 2151.352 is to insure to the juvenile his right to counsel and/or his right to have his parents present at any hearing. In our opinion, such a provision is not intended to and does not take away from a trial court its basic right to order a separation of *witnesses* until such time as such witnesses have testified. During such time the exclusion is not of parents, as such, but instead is the exclusion of witnesses.

Moreover, during such time as the parents were so excluded, the juvenile was fully and adequately represented by two attorneys. Under these circumstances, no possible prejudice to the juvenile could result from such exclusion.

### III

The Podojil fire took place on December 25, 1969. It appears that everything was in order at the home when Mrs. Podojil left at approximately 8:00 p. m., and she received a telephone call notifying her of the fire approximately 45 minutes later.

By way of defense, both Mr. and Mrs. Ostrowski and a Mr. and Mrs. Seitz, who were visitors at their home that day, testified that James was home.

The trial court sustained certain objections to questions propounded to both Mr. and Mrs. Seitz, but none of these objections were sustained upon the basis of any requirements of R. C. 2945.58. The basis of the sustaining of such objections, in each case, appears to have been the failure of the witness to testify as to the times during that day when he or she had actually seen James, before being permitted to testify in general language as to whether they had any knowledge of James being absent from the home.

A careful examination of the testimony of the four witnesses as to "alibi" that day, Mr. and Mrs. Ostrowski and Mr. and Mrs. Seitz, reveals that the court, by its rulings, did not preclude any proper testimony, and no reference was ever made to any requirement of written notice of alibi.

In its brief in the Court of Appeals, the prosecution, for the first time, made reference to R. C. 2945.58, claiming, as an additional argument, that since none of the Seitz's testimony was in compliance with the requirements of that statute, there could be no error in excluding any of it in any event.

Observing that R. C. 2945.58 requires "a defendant in a criminal cause" to give notice in writing of his intention to claim an alibi, the Court of Appeals concluded that the requirements of this statute are not applicable to juvenile proceedings, and that "it was therefore error to exclude the testimony on this ground."

An examination of the record, however, clearly indicates that no testimony was excluded "on this ground."

IV

The fourth ground for reversal, relied upon by the Court of Appeals, concerned certain testimony by the Fire Chief, elicited on redirect examination and relating to the basis of information contained in his official report. At the time such testimony was given the report had been introduced in evidence by the defense, and the witness had been interrogated by defense counsel as to certain check marks placed thereon as to the sex and age bracket of the person who "caused" such fire. The prosecution then questioned the Fire Chief concerning the source of the information which caused him to enter such check marks, whereupon the Fire Chief, in effect, stated that he knew about James Ostrowski and that "he [Officer Maiotti] told me he did it."

The trial court, in overruling the objection of the defense, concluded that counsel had "opened the door"; that the line of questions was directed to show that there was "somebody else"; that the Fire Chief "had another

suspect that hasn't been mentioned here''; and that the evidence indicating that James Ostrowski was the 15-to-18-year-old male referred to in the report, therefore, became admissible.

We agree with the trial court that the line of questions pursued by counsel for the defense did ''open the door'' for an explanation by the Fire Chief as to the basis for his information in filling out that portion of the report as to which he had been specifically subjected to examination by defense counsel.

In any event, from an examination of the entire record, this single bit of evidence cannot be considered as being actually prejudicial.

We conclude, therefore, that the Court of Appeals erred in reversing the judgment herein.

In addition to the bases for reversal relied upon by the Court of Appeals, it is claimed on behalf of the juvenile (although no cross-appeal was filed) that the judgment of the trial court is also subject to reversal on other bases. We conclude that there is no merit to these claims, one of which is that a juvenile has a constitutional right to trial by jury. Such a claim has been specifically rejected by the United States Supreme Court in *McKeiver* v. *Pennsylvania* (1971),     U. S.    , 29 L. Ed. 2d 647.

For the reasons stated, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

O'NEILL, C. J., SCHNEIDER, HERBERT, CORRIGAN and STERN, JJ., concur.

BROWN, J., dissents.