Moses C. BROWN, Jr., Appellant,

v.

UNITED STATES, Appellee.

Nos. 7608 and 9521.

District of Columbia Court of Appeals.

Argued Oct. 12, 1976.

Decided March 28, 1978.

Gene C. Lange and Edwin A. Williams, Washington, D. C., appointed by this court, with whom Edward M. Shea, Washington, D. C., also appointed by this court, was on the brief, for appellant.

Henry F. Greene, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before GALLAGHER, NEBEKER and YEAGLEY, Associate Judges.

NEBEKER, Associate Judge:

Appellant was convicted of threatening to injure the person of Dr. Harlan Randolph, the then-president of Federal City College, in violation of D.C.Code 1973, § 22–2307. He appeals that conviction and, separately, an order of the trial court denying his motion, filed while his original appeal was pending, for a new trial. He bases these consolidated appeals on three claims of error. First, he claims that the trial court erred in admitting into evidence an identification based on a spectrographic comparison of appellant's voice with the voice of the person making the threatening telephone calls. Second, he finds error in the trial judge's refusal to qualify one of the defense witnesses, proffered at the hearing on the new trial motion, as an expert in the technique of identification through the analysis of voice spectrograms. Finally, he contends that his trial counsel did not render effective assistance. We hold that these claims do not warrant reversal either of the judgment of conviction or of the order denying the motion for a new trial.

■ Throughout the winter and spring of 1972, Dr. Harlan Randolph received 26 telephone calls from an unknown caller. The caller generally warned Dr. Randolph that he would be killed if the College executed a planned reduction in the size of its staff. The evidence adduced at trial that appellant was the caller consisted of circumstantial evidence;[1] an admission on two occasions by appellant to a co-worker at the College that he was the caller; voice identifications of appellant by Dr. Randolph and Claude Williams, the College Director of Security, both of whom heard the threatening calls; and the opinion evidence of Lieutenant Ernest Nash of the Michigan State

Police Department that voice spectrograms[2] made from tape recordings of the threatening telephone calls and from an exemplar of appellant's voice were sufficiently similar to permit him to conclude that the speakers were the same. The introduction of this last evidence is at the heart of all three of appellant's claims of error.

Lieutenant Nash's opinion, based upon his analysis of voice spectrograms, was admitted into evidence after two pretrial hearings in which the trial court considered the admissibility of voice spectrographic identifications in general and of Lt. Nash's identification evidence in particular.

In the first of these hearings, Dr. Oscar Tosi testified concerning his qualifications as an expert in voice identification and related fields, described the process by which voice identifications may be made by comparison of voice spectrograms, and related the history and progress of the science of voice spectrography. Based upon his own work in the field and his knowledge of the work of others, Dr. Tosi concluded that identifications based upon comparison of voice spectrograms, assuming the use of properly operating equipment by a qualified examiner-analyst, were reliable and that the scientific premises for such identification were accepted by the scientific community.

In the second hearing, Lt. Nash was called as an expert examiner-analyst in support of the admissibility of the particular evidence which was to be introduced in this trial. He related his qualifications and described the process by which he concluded that appellant was the person who had made the threatening telephone calls to Dr. Randolph. During this testimony, it was

1. This included evidence that appellant would have been adversely affected by the proposed staff reduction and that the threatening calls were traced to the general vicinity of appellant's office at the College.

2. Voice spectrograms are visual representations of the volume, pitch, and duration of sound produced by the human voice. The scientific theory upon which voice spectrographic

identification is premised is that every human voice is unique and that the qualities of uniqueness can be electronically reduced to visual representation (voice spectrograms) through a voice spectrograph. Proponents of this theory assert that a person trained in the recognition of these qualities can render an opinion as to whether two or more voice spectrograms were made by the same person.

brought out that the tape recorder used to record appellant's voice for the exemplar spectrogram was "apparently defective" because the tape was recorded at the wrong speed. Lt. Nash testified, however, without contradiction, that he had been able to compensate for this apparent defect. The defense offered no expert witness to contradict either Dr. Tosi's testimony that voice spectrographic evidence was a reliable means of identification or Lt. Nash's testimony that the evidence in this case was reliable.

At trial, Dr. Tosi again testified that voice spectrographic evidence was reliable, and Lt. Nash testified that the particular evidence in this case was reliable and that he was able to identify appellant from this evidence as the person who made the threatening telephone calls. The defense again relied solely upon cross-examination, but the fact that the voice exemplar may have been defective was not elicited.

Appellant appealed his conviction, but the appeal was held in abeyance to permit the trial court to consider appellant's motion for a new trial, filed by new counsel. That motion alleged that appellant had been denied the effective assistance of counsel at trial and that appellant would proffer newly discovered evidence relating to the effect of the defective exemplar upon the reliability of the identification.

The matter of the defect was apparently brought to the attention of Dr. Tosi for the first time in preparation for the new trial hearing. As a result of conversations with Dr. Tosi, the prosecutor represented to the trial judge that the government would no longer vouch for the reliability of the Nash identification at trial. At the evidentiary hearing, however, the government changed its position and introduced evidence that a new, nondefective exemplar of appellant's voice showed the same similarities to the voice of the person who made the threatening telephone calls as did the allegedly defective exemplar and that, therefore, the reliability of the trial identification was unaffected by the alleged defect. But Dr. Tosi, the government's only witness in sup-

port of general admissibility at the pretrial hearings and at trial, testified that his own examination of the exemplars indicated a 4 to 11 percent difference in pitch between the exemplar used at trial and the subsequently recorded exemplar. This difference, he testified, could have been due to imperfect attempts by Lt. Nash (who did not appear at these hearings) to adjust the speed of the first exemplar. Dr. Tosi concluded that it was improper for Lt. Nash to have attempted to make an identification on the basis of this exemplar, particularly since appellant had been available before trial to provide a more satisfactory exemplar. He then reiterated his pretrial testimony that the reliability of voice spectrographic identification was dependent upon the use of proper evaluation techniques by the expert examiner-analyst.

Other testimony at this hearing focused on two issues. First, on the question of effective assistance of counsel, appellant's trial counsel testified that, in preparation for trial, he had consulted with a number of experts concerning the principles and techniques of voice spectrographic identification and had concluded that, rather than relying on experts who would be very vulnerable to cross-examination, he would attempt to impeach the government's witnesses through his own cross-examination. Second, the court heard the testimony of a number of witnesses for and, for the first time, against the admissibility, in general, of voice spectrographic identifications.

The use of voice spectrographic evidence at trial—and, indeed, the science of voice spectrography itself—is a relatively recent phenomenon. Experiments by Lawrence Kersta in the early 1960's produced a high rate of identification accuracy and led to the first appellate court approval of the use of voice spectrographic identification evidence. *See United States v. Wright,* 37 C.M.R. 447 (U.S.Ct.Mil.App.1967); Decker & Handler, *Voiceprint Identification Evidence—Out of the* Frye *Pan and into Admissibility,* 26 Am.U.L.Rev. 314, 320–22, 334–35 (1977). Both Kersta's credentials and his methodology were criticized, how-

ever, leading to the rejection of this type of evidence by two appellate courts. *See People v. King,* 266 Cal.App.2d 437, 72 Cal.Rptr. 478 (1968); *State v. Cary,* 56 N.J. 16, 264 A.2d 209 (1970), *aff'g* 99 N.J.Super. 323, 239 A.2d 680 (1968). More recent experiments by Dr. Tosi, the government's expert witness, have led a number of appellate courts to conclude that such evidence is sufficiently reliable to be admitted in criminal prosecutions. *United States v. Jenkins,* 525 F.2d 819 (6th Cir. 1975); *United States v. Baller,* 519 F.2d 463 (4th Cir. 1975); *United States v. Franks,* 511 F.2d 25 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *Alea v. State,* 265 So.2d 96 (Fla.Dist.Ct.App.1972); *Worley v. State,* 263 So.2d 613 (Fla.Dist.Ct.App.1973); *Reed v. State,* 35 Md.App. 472, 372 A.2d 243 (1977); *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671 (1975); *State v. Olderman,* 44 Ohio App.2d 130, 336 N.E.2d 442 (1975). *See State ex rel. Trimble v. Hedman,* 291 Minn. 442, 192 N.W.2d 432 (1971) (admissible to establish probable cause; admissible at trial (dictum)). *See also* Greene, *Voiceprint Identification: The Case in Favor of Admissibility,* 13 Am.Crim.L.Rev. 171, 184–89 (1975) (citing numerous trial court rulings admitting such evidence). But a number of appellate courts remain unconvinced that spectrograph voice identification evidence is sufficiently reliable to permit introduction at trial. *United States v. McDaniel,* 176 U.S.App.D.C. 60, 538 F.2d 408 (1976); *United States v. Addison,* 162 U.S.App.D.C. 199, 498 F.2d 741 (1974); *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *People v. Tobey,* 401 Mich. 141, 257 N.W.2d 537 (1977); *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977).[3]

While the greater number of appellate opinions favor the admissibility of such evidence, the recent opinions (cited above) denying admission indicate the absence of a clear trend. Cogent reasons, enunciated by members of well-respected courts, are available on both sides. In view of the continuing debate on this subject, and in light of the state of this record on the issue of reliability of this particular voice sample, we decline to adopt the trial court's ruling that voice spectrographic identification evidence was shown to be sufficiently reliable and accepted within the scientific community to permit its introduction in this criminal case. If error, however, the error was harmless. *See United States v. McDaniel, supra; United States v. Addison, supra.* As in both *McDaniel* and *Addison,* the other, nonspectrographic identification of appellant as the perpetrator of the crime was overwhelming. Appellant's motive and opportunity were shown by circumstantial evidence, corroborating his admissions of the crime to a co-worker and the aural identification of his voice by two persons who had had ample opportunity to hear the telephoned threats.

As in both *McDaniel* and *Addison,* we do not foreclose a future decision, upon an appropriate record, that expert opinions based upon voice spectrographic evidence are, in general, admissible to prove identity. *See also People v. Kelly, supra,* 130 Cal. Rptr. at 155, 549 P.2d at 1251 ("decision is not intended in any way to foreclose the introduction of voiceprint evidence in future cases").

▮ The resolution of the remaining assignments of error follows from our holding on this issue. Appellant's assertion that the trial judge improperly refused to qualify appellant's proffered expert is moot, for his evidence was to have borne upon the question of admissibility of the voice spectrographic identification. Appellant's assertion that the assistance of trial counsel was constitutionally ineffective was premised upon the failure of counsel to present expert witnesses against the admissibility of voice spectrographic identification evidence or to effectively cross-examine the government's witnesses in support

---

3. We note that, in each opinion, the court expressed its willingness to reconsider the question of admissibility. In *McDaniel,* for example, the court noted that "[i]t may well be that the time has come to reexamine the holding of *Addison*" but indicated its reluctance to do so without en banc reconsideration. 176 U.S.App. D.C. at 65, 538 F.2d at 413.

of admissibility. Because, however, we hold that the introduction of this evidence was harmless, if error, it cannot be said that any failure of trial counsel excluded a "substantial defense" to the criminal charges, *Angarano v. United States*, D.C. App., 312 A.2d 295, 299 (1973), even were we to assume, which we do not, that trial counsel's representation demonstrated "gross ineptitude." *Id.*

The conviction is

*Affirmed.*